UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL BRYANTON, et al,

              Plaintiffs,                CASE NO. 12-14114

v.                                  PAUL D. BORMAN
                                  UNITED STATES DISTRICT JUDGE

RUTH JOHNSON, in her official capacity
as Michigan Secretary of State,

              Defendant.
_____/

## ORDER GRANTING PLAINTIFFS' MOTION
## FOR PRELIMINARY INJUNCTION[1]

### I.  INTRODUCTION

This matter is before the Court on Plaintiffs Michael Bryanton, Glenn Rehahn, Cheryl

Merrill, Richard L. Robinson, Service Employees International Union, Local 517M, SEIU

Michigan State Council, Latin Americans for Social and Economic Development (LA SED), and

the American Civil Liberties Union of Michigan's (collectively, "Plaintiffs") Motion for

Preliminary Injunction, filed on September 20, 2012.[2]  (Dkt. No. 4.)  Defendant Ruth Johnson

("Defendant"), the Michigan Secretary of State, filed a Response on September 25, 2012.  (Dkt.

---

[1] There are two attachments to this Opinion: 1. Application to Vote form; 2. Michigan Senate Bill 803.

[2] Plaintiffs had previously filed a Complaint for injunctive and declaratory relief on September 17, 2012 (Dkt. No. 1).

No. 12.)  Plaintiffs filed a Reply on September 28, 2012.[3]  (Dkt. No. 18.)  The Court held a six

hour hearing on Friday, October 5, 2012; testimony was taken from Christopher Thomas,

Director of Elections, Office of the Michigan Secretary of State.[4]

Plaintiffs' Complaint alleges Four Counts: I Deprivation of Federal Equal Practices

Under the Fourteenth Amendment to the Constitution; II Violation of the Federal Voting Rights

Act, Section 5; III Violation of the Michigan Election Law; and IV Violation of the Michigan

Administrative Proceedings Act and Michigan Election Law.

At the hearing, Defendants produced a letter, dated October 4, 2012, from the Voting

Section of the Civil Rights Division U.S. Department of Justice stating that it "does not interpose

any objection to the specified change" in the Defendant's check box proposal form.[5]

Accordingly, the Court will not discuss Count II.

Because the Court finds that Plaintiffs have a strong likelihood of success on Count I –

Federal Equal Protection – and that the balance of equities weigh in favor of granting an

injunction, the Court will not deal with state law based Counts III and IV.

---

[3]Plaintiffs also filed a Supplemental Brief in support of their Motion for Preliminary Injunction on September 21, 2012, which included over 360 pages of exhibits.  The Court struck Plaintiffs' Supplemental Brief in an Order entered on September 27, 2012, because it violated Eastern District of Michigan Local Rules 7.1(e)(1) and (g)(1).  *See* Sept. 27, 2012 Order at 2. (Dkt. No. 14.)

[4]Christopher M. Thomas has served under the Michigan Secretary of State as the Director of Elections since 1981.  (Thomas Aff. ¶ 2.)  "The director of elections shall be vested with the powers and shall perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of the election laws."  Mich. Comp. Laws § 168.32(1).

[5] Defendant's Exh. 523.

Accordingly, for the reasons stated below, the Court GRANTS Plaintiffs' Motion for Preliminary Injunction against Defendant Michigan Secretary of State Ruth Johnson in her official capacity.

## II.  BACKGROUND

This Court recognizes and confirms that only citizens of the United States and residents of the State of Michigan have the right to register to vote, and to thereafter vote in the State's November 6, 2012 general election, that elects the President and Vice President of the United States, a United States Senator, all Michigan members of Congress, multiple state and local officials, and state Justices/Judges.  Also on this November 6, 2012 ballot are six statewide proposals for amending the State Constitution, and many local ballot initiatives. As an example, the four page Detroit ballot contains, in addition to the above-mentioned, 5 Wayne County proposals, 5 City of Detroit proposals, and 2 Local Education proposals.  There are projected to be close to 5 million statewide voters in the November 6, 2012 election, a huge ballot with many confusing issues: "think" long lines and long times to vote.

Article I Section 4 of the United States Constitution states: "The Times, Places and Manner of holding Elections . . . shall be prescribed in each State by the Legislature thereof . . . ."

State legislation provides Defendant Ruth Johnson, the Michigan Secretary of State with the task of overseeing the State's election process MCL 168.31.  State legislation provides that only citizens of the United States and the State of Michigan are eligible to vote in the November 6, 2012 election, MCL 168.492.  Significantly, State legislation sets forth the specific requirements for the voter application forms, MCL 168.523(1) in person; 168.759(5) absentee;

affirmation of United States citizenship is one of the specific legislative requirements for voter registration; it is not one of the specific requirements for the voter application form.

Plaintiffs in the instant action seek declaratory and injunctive relief prohibiting Defendant from including a "citizenship checkbox" on Applications to Vote utilized at the polling places, and in  Applications for Absent Voter Ballots in Michigan.  Since the filing of this lawsuit, Defendant has eliminated the "citizenship checkbox" for absentee voter ballot applications on the Secretary of State website.

The Court finds relevant that Defendant Secretary of State, in addition to adding the "citizenship checkbox" to the polling place voter application form, has also instructed that if a voter does not fill in the checkbox, the elections official is to confront that voter as follows: tell that voter to fill in the checkbox; if the voter does not, read that voter a statement that you must be a citizen of the U.S. and Michigan to vote, and then provide the voter with a ballot.

Plaintiffs contend that Defendant's addition of the question "Are you a United States Citizen?" with a "yes" or "no" check box on the polling place ballot application and the required election official public confrontation with the voter, in the context of this years November election with a likely turnout of 5 million state voters, violates the Equal Protection Clause of the Fourteenth Amendment, and Michigan law.

**A.  Michigan's Elections System**

Michigan has the most decentralized elections system in the nation.  (Def.'s Resp. Appx., Ex. A, Structure of Michigan's Elections System at 8.)  Administration of elections is divided

among 1,692 county and local[6] elections officials with the Secretary of State serving as the "chief election officer," and exercising supervisory control over the local officials.  (*Id*.)

As the state's chief election officer, Michigan's Secretary of State is directed to "issue instructions and promulgate rules pursuant to the administrative procedures act . . ., for the conduct of elections and registrations in accordance with the laws of [Michigan]."  Mich. Comp. Laws § 168.31(1)(a) (emphasis added).  The Secretary of State must also "[a]dvise and direct" the local elections officials regarding the conduct of elections.  Mich. Comp. Laws § 168.31(1)(b).  The local elections officials, in turn, train their staffs according to the Secretary of State's instructions.

The Secretary of State is also directed to "[p]rescribe and require uniform forms, notices, and supplies the secretary of state considers advisable for use in the conduct of elections and registrations."  Mich. Comp. Laws. § 168.31(1)(e).  However, this power is limited with regard to the content for applications for ballots, where the Michigan legislature has prescribed specific requirements.

To vote at the polls on election day, Michigan law requires voters to provide a valid photo identification and to fill out and sign "an application showing his or her signature or mark and address of residence in the presence of an election official."  Mich. Comp. Laws § 168.523(1). In some situations, the voter is also required to fill out his date of birth.  Nothing else is directed by the State Legislature in M.C.L. 168.523(1).

To acquire an absent voter ballot, Michigan law provides as follows:

---

[6]Specifically, Michigan has 83 county clerks, 274 city clerks, 1,242 township clerks, and 93 village clerks.  (Structure of Michigan's Elections System at 8.)

The absent voter ballot application shall be in substantially the following form:

"Application for absent voter ballot for:

[ ] The primary or special primary election to be held on ......, 19 ....

[ ] The election to be held on .........., 19....

(Check applicable election or elections)

I, .........., a qualified and registered elector of the .......... precinct of the township of .......... or village of .......... or of the .......... ward of the city of .........., in the county of .......... and state of Michigan, apply for an official ballot, or ballots, to be voted by me at the election or elections as requested in this application.

The statutory grounds on which I base my request are:

[ ] I expect to be absent from the community in which I am registered for the entire time the polls are open on election day.

[ ] I am physically unable to attend the polls without the assistance of another.

[ ] I cannot attend the polls because of the tenets of my religion.

[ ] I have been appointed an election precinct inspector in a precinct other than the precinct where I reside.

[ ] I am 60 years of age or older.

[ ] I cannot attend the polls because I am confined to jail awaiting arraignment or trial.

(Check applicable reason)

Send absent voter ballot to me at:

 ...........................................................
(Street No. or R.R.)

6

```
............................................................
(Post Office) (State)


My registered address
.......................................................................................
 (Street No. or R.R.)
 .......................................................................................
 (Post Office) (State)

Date...............................................................................
```

I declare that the statements in this absent voter ballot application
are true.

```
  ..................................................................
  (Signature)
```

. . . .

Mich. Comp. Laws § 168.759(5). Thus, neither the legislatively enacted requirements for an

application to vote at the polls or the absentee voter ballot request require a citizenship check

box.

Michigan's voter registration law states that only United States Citizens are permitted to

register to vote under Michigan law.  *See* Mich. Comp. Laws § 168.492 (setting forth the

qualifications for registration to vote as follows: "The person shall be a citizen of the United

States; not less than 18 years of age; a resident of the state for not less than 30 days; and a

resident of the township, city, or village on or before the thirtieth day before the next regular or

special election or primary election.").  That registration process occurs well before the polling

place vote involving the ballot application form at issue in the instant case.  To reiterate,  neither

the polling place application nor the absent voter application, as set forth under Michigan law, require any proof or affirmation of the registered voter's status as a United States Citizen.

**B. Additional State Legislation**

The Michigan legislature passed Public Act 163 in October 2011, which changed the process for voting in a presidential primary election beginning with the February 28, 2012 primary election. (Thomas Aff. ¶ 7.) The law provides that voters in a presidential primary election must select which political party ballot they wished to complete. For voters appearing in-person, the law provides that the "elector shall indicate in writing, on a form prescribed by the secretary of state, which political party ballot he or she wishes to vote . . . ." Mich. Comp. Laws § 168.615c(1). For absentee voters, the law specifically directed the Secretary of State to "revise the absent voter ballot application form described in section 759 or provide a separate form to require that a presidential primary elector indicate a political party ballot selection . . . ." Mich. Comp. Laws § 168.759c (footnote omitted). Thus, Defendant did not unilaterally change the ballot applications for the February 28, 2012 presidential primary under the power to "[p]rescribe and require uniform forms . . . in the conduct of elections," as set forth in § 168.31(1)(e). Instead Defendant responded to the Michigan legislature's passage of legislation specifically directing the implementation of these Presidential Primary changes.

On October 21, 2011, Defendant directed elections officials to add a ballot selection area to all Applications to Vote at polling places and for Absent Voter Applications used during the February 28, 2012 presidential primary election. (Thomas Aff., Ex. 4, Oct. 4, 2011 Release.) In addition, Defendant requested that elections officials add a "Citizenship Verification" question to all voter applications, beginning with the February 2012 primary election:

8

> Many jurisdictions have previously or are currently including the
> "*Are you a United States Citizen?*" question on Applications to
> Vote.  This question must be added to all Applications to Vote for
> all future elections, beginning with the February 28, 2012
> Presidential Primary.  The question should be followed by Yes/No
> selections and ovals or arrows for the voter to fill in . . . .
>
> In addition, Absent Voter Ballot Applications must now
> include a citizenship verification statement and check-box.  The
> statement shall read: "*I am a United States Citizen.*"  This
> statement and check-box should appear above the area that asks for
> the voter's statutory reason for the absent voter ballot request.

(*Id.* (emphasis in original).)

On November 8, 2011, Senate Bill No. 803 was introduced in the Michigan legislature.

Mi. S. Jour., 2011 Reg. Sess. No. 89 (Nov. 8, 2011).  This bill sought to amend Mich. Comp.

Laws §§ 168.523 and 168.759, which deal with applications of ballots, to require "[a]n

affirmative statement by the elector that he or she is a citizen of the United States."  (Compl., Ex.

1, Senate Bill 803.)  The bill also provided that an elector who failed to affirmatively state, or

swear under oath, that he or she is a citizen should be denied a ballot.  (*Id.*) Defendant Secretary

of State Ruth Johnson testified in support of the legislative proposal.

On January 20, 2012, Defendant issued an informational bulletin to elections officials

with guidance regarding the February 28, 2012 presidential primary.  (Thomas Aff., Ex. 5, Jan.

20, 2012 Election News.)  Regarding the citizenship question, Defendant wrote:

> If an application is submitted without a response to the citizenship
> question:
>
> **Absentee ballot application:**  Issue a ballot.
>
> **Application to vote (polls):**  Ask voter to respond, if he/she refuses
> – inspectors will have to swear the voter in under the standard
> challenge process to determine citizenship status.  If voter answers

9

> 'no' or refuses to answer during the challenge process – Do NOT
> issue a ballot.  Place application to vote in the clerk's envelope,
> make a note in the remarks section of poll book and on the
> [Qualified Voter File] list alerting the local clerk that follow-up is
> necessary.  *Local clerk:  follow procedures below for "no"
> responses to notify/cancel these voters.*

(*Id.* (emphasis in original).)

With regard to in-person applications to vote, Defendant's January 20, 2012 directions to elections officials match the process set forth in proposed Senate Bill 803, for which Defendant testified in support, but which was subsequently vetoed by Governor Rick Snyder in July, 2012.

Thus, per Defendant Johnson's directions, in early 2012, absentee ballot applicants would receive a ballot if they did not respond to the citizenship question; polling place voters would be denied a ballot if they did not respond to the citizenship check box.

Director of Elections Thomas states that "[o]ver 1.2 million voters cast ballots at the February 28, 2012 Republican Party Presidential Primary, yet the Bureau of Elections did not receive any complaints regarding the citizenship verification question."  (Thomas Aff. ¶ 11.)

Both houses of the Michigan legislature passed Senate Bill 803 in June 2012.  However, the bill did not become a legislative enactment, because on July 3, 2012, Michigan Governor Rick Snyder vetoed the Bill, stating:

> Enrolled Senate Bill 803 requires voters to affirm their citizenship
> by checking a box before their ballot is counted.  I am concerned
> that Enrolled Senate Bill 803 could create voter confusion among
> absentee voters.  I appreciate the issue of ensuring that voters are
> properly qualified including the requirement that they are U.S.
> citizens.  An alternative would be to simply include US citizen in
> the voter's opening declarative statement on the application.

(Compl., Ex. 4, Veto Letter.) (emphasis added). Thus, in vetoing Senate Bill 803, Governor Snyder provided Defendant Secretary of State with an alternative that places on the application forms for absentee and poll voters a statement that they must be U.S. Citizens, thereby avoiding a face-to-face public confrontation with election workers with regard to the citizenship checkbox.

## C.  The August 2012 Primary Election

On August 6, 2012 – over a month after Governor Snyder's veto and only one day before the August 7, 2012 primary election – Defendant issued the following "Reminder" to local elections officials:

> Jurisdictions that are utilizing *Applications to Vote* and/or *AV Ballot Applications* containing the question "*Are you a United States Citizen?*" should follow the processes previously provided for the February 28, 2012 Presidential Primary.

(Thomas Aff., Ex. 7, Aug. 6, 2012 Release (emphasis in original).) That February 28, 2012 process being: no affirmative response, no ballot.

Defendant admits that the Bureau of Elections began receiving complaints regarding the citizenship verification question during the morning of the August 7, 2012 primary election. (Def.'s Resp. 7.)  In response to these issues, Defendant issued a "clarification" at about midday on August 7.  The Defendant's "clarification" provided that voters who refuse to answer the citizenship verification question should ultimately be provided a ballot, but only after the poll worker directs them to respond to the citizenship question and fill in the box, and if the voter continues to refuse, the election official must read the following statement to the voter: "Under the Michigan Constitution and election laws you must be a citizen of the United States in order

11

to vote" (Thomas Aff., Ex. 8, Aug. 7, 2012 Release), the election worker is to provide a ballot to

the applicant.   Thus, Defendant Secretary of State has created a public verbal confrontation

between the election official and the voter. Yet, after singling out and confronting the voter in

front of other voters, poll challengers and other election workers, the end result is that the voter

is provided the ballot by the election official, albeit reluctantly, since the voter refused to comply

with the election order to fill out the citizenship check box.

Evidence before the Court established that the use of the citizenship question during the

August 7, 2012 primary led to delays for voters at the polls.  Plaintiff Richard L. Robinson, the

Executive Director of the Campaign Finance Network,  states that he was denied a ballot when

he attempted to vote at 9:00 a.m., because he refused to answer the citizenship verification

question.  (Compl., Ex. 7b, Robinson Aff. ¶ 3.)  However, returning to his polling location after

4:00 p.m. Plaintiff Robinson was permitted to vote without filling in the check box. (Robinson

Aff. ¶ 10.)

Plaintiff Glenn Rehahn states that when he refused to answer the citizenship question at

the polls at approximately 2:00 p.m., he was denied a ballot.  (Compl., Ex. 7b, Rehahn Aff. ¶¶ 5,

9.)  When he returned to his polling location at around 5:00 p.m., Plaintiff Rehahn was given a

ballot, despite still refusing to answer the citizenship question.  (Rehahn Aff. ¶¶ 15, 16.)

Several nonparties have also submitted affidavits attesting to delays that were caused due

to their refusal to complete the citizenship question.  Tyler White alleges that he was delayed 20

to 30 minutes because he refused to check the citizenship question.  (Compl., Ex. 7c, White Aff.

¶ 6.)  Likewise, Ryan Irvin states that he argued with elections officials at his polling location for

8 to 10 minutes after refusing to answer the citizenship question, but was then given a ballot.

12

(Compl., Ex. 7e, Irvin Aff. ¶¶ 5, 11.)  Leroy Pletten, the precinct chairperson for Precinct 53 in

Warren, Michigan during the August 7, 2012 primary, states that he "noticed a number of

incidents in which the citizenship check box slowed the process down."  (Compl., Ex. 7f, Pletten

Aff. ¶ 5.)  Alex Citron and Travis Boak both allege that they were delayed for 15 minutes

because of confusion regarding the citizenship checkbox.  (Compl., Ex. 7h, Citron Aff. ¶ 8; Ex.

7g, Boak Aff. ¶ 7.)

**D.  Current Status of the Citizenship Verification Question**

Regarding absentee voter ballot applications, Plaintiffs assert that although Defendant

has directed local elections officials to include the citizenship verification question on all the

applications, the absentee ballot application available for download on Defendant's website does

not include a citizenship verification question.  (Compl., Ex. 9, Absent Voter Ballot

Application.)  Defendant's present position is that whether or not an absentee voter applicant has

a form containing the citizenship question, all absentee voter applicants will receive a ballot.

Plaintiffs have provided evidence showing that, as of September 5-13, 2012, in Ingham,

Macomb, Saginaw, Washtenaw, and Wayne counties, some local clerks were using absentee

voter applications with a citizenship verification question while others were not, and that

enforcement of that question was not uniform with regard to absentee voters.  (Compl., Ex. 10,

Laura Misumi Decl. ¶¶ 5-42.) (Pl. Exh. 136)

According to the Misumi Declaration, the City Clerk for the City of Lansing in Ingham

County was using applications with and without the citizenship verification question, and was

issuing ballots when an applicant refused to answer the citizenship question.  (Misumi Decl. ¶ 6.)

13

In Macomb County, an Elections Assistant explained that the citizenship question had been removed from all absent voter ballot applications, and ballots were issued to absentee voters who refused to answer the question. (Misumi Decl. ¶ 14.) However, in Bruce Township in Macomb County, the Deputy Clerk/Election Clerk explained that he would send an absentee voter application back to the applicant if it did not answer the citizenship question. (Misumi Decl. ¶ 16.)

In Saginaw, the Buena Vista Township Deputy Clerk was using an absent voter ballot application that did not have the citizenship question. (Misumi Decl. ¶ 17.) The Deputy Clerk further stated that, on election day, if a voter had a photo ID, they need not complete the citizenship verification question. (Misumi Decl. ¶ 18.)

According to the Misumi Declaration, the Washtenaw County Director of Elections intended to "make available to the printers and vendors applications to vote that do and do not have the [citizenship] checkbox, and will support the local level choice."[7] (Misumi Decl. ¶ 20.) The City of Ann Arbor in Washtenaw County was using applications that included the citizenship question, but was issuing ballots to absentee voters regardless of whether the citizenship question was completed. (Misumi Decl. ¶ 22.) In the cities of Chelsea and Ypsilanti, also in Washtenaw County, the local clerks were issuing provisional ballots to absentee voters who did not complete the citizenship question. (Misumi Decl. ¶ 24, 26.) Absent voter ballot

---

[7]After Misumi spoke with the Director of Elections, on September 13, 2012, the Washtenaw County Election Commission voted to leave the citizenship question off of ballot applications. *See* Chad Livengood, *Clerks defy ballot citizenship rule*, Detroit News, Sept. 14, 2012. (Compl., Ex. 12.)

applications in Dexter Township did contain the citizenship verification question (Misumi Decl. ¶ 32), while the applications in Webster Township did not (Misumi Decl. ¶ 34.)

In Wayne County, the City of Belleville website had an absent voter ballot application available for download that did not contain a citizenship verification question, but the City Clerk was sending hard copies of the applications with a citizenship verification question. (Misumi Decl. ¶¶ 36, 37.) Similarly, in the City of Detroit, the absent voter ballot application available on the website did not contain a citizenship verification question, but the hard copy applications mailed by the City Clerk's office did include the question. (Misumi Decl. ¶¶ 39, 40.) In the City of Flat Rock, if the clerk's office received an absent voter ballot application without a citizenship question, or without an answer to the citizenship question, the office would send a new application to the voter with the citizenship question highlighted. (Misumi Decl. ¶ 42.)

Evidence at this Court's hearing clearly established that use of the citizenship verification question will be non-uniform in applications for ballots issued to voters appearing at the polls on election day. The clerks in Macomb County and Lansing have publicly stated that they will remove the citizenship question from ballot applications. Chad Livengood, *Clerks defy ballot citizenship rule*, Detroit News, Sept. 14, 2012. (Compl., Ex. 12.) The City Clerk for Dearborn in Wayne County has also stated that, as a cost-savings measure, the city will use old ballot applications that do not have the citizenship question. (*Id*.)

Plaintiffs argue that, based on the problems experienced during the August 7, 2012 primary election, use of the citizenship verification question during the November 6, 2012 general election will be inconsistent and lead to significant delays in the voting process for all voters at the polls. Plaintiffs point out that voter turnout will be much higher for the November

6, 2012 general election, and ballots will be "extraordinarily long" (Pl.'s Resp. 1), which will magnify the issues encountered on August 7. Indeed, at this Court's hearing, Christopher Thomas, Director of Elections in the Secretary of State's Office testified that he expects 4.8 million voters for the November 6, 2012 election, and also acknowledged a very long ballot containing six statewide proposed constitutional amendments and many local proposals.

Plaintiffs' argument further focuses on the shifting standard of enforcement by Defendant of the citizenship question at the August 7 Primary election pre noon, no ballot; after noon, get ballot. Plaintiffs note that some election workers were unaware of Governor Snyder's veto of Senate Bill 803 that contained the citizenship check box requirement, and also some polling locations treated voters differently who refused to answer the citizenship question, depending on the time of day they attempted to vote. (Pls.' Mot. 12-13.)

Defendant argues that the citizenship verification question serves an important governmental interest, because some non-citizens may have been mistakenly registered to vote when applying for a Michigan driver's license.[8] According to Defendant, this legitimate governmental interest outweighs any potential harm caused by administration of the check box question ordered by Defendant. Defendant also contends that any confusion over the citizenship verification question was resolved during the August 7, 2012 primary, and points out that the Bureau of Elections did not receive any complaints regarding the question during a September 5,

---

[8]Under the National Voter Registration Act of 1993 (A.K.A. Motor Voter Act), "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration . . . ." 42 U.S.C. § 1973gg-3(1). Defendant states that, prior to 2008, Secretary of State employees did not inquire about the citizenship status of driver's license applicants before offering them an opportunity to register to vote. (Def.'s Resp. 7-8.)

2012 Special Primary in the 11th Congressional District.  (Thomas Aff. ¶ 18.)  That September

2012 Special Primary in the 11th Congressional District.  (Thomas Aff. ¶ 18.)  That September

5, 2012 election involved only a minuscule number of voters in one Congressional District.

Defendant notes that she has since issued supplemental instructions to clerks regarding

the citizenship question.

> a. For voters who appear in the polling place on Election Day and refuse or neglect to answer the citizenship question, "read this statement: 'Under the Michigan Constitution and election laws you must be a citizen of the United States in order to vote.'  Then issue a ballot to the voter."

> b. For absentee voters who did not respond to the citizenship verification question on the Absent Voter Ballot Application, issue a ballot regardless of the voter's failure to answer.  Clerks are not required to pursue an answer to the citizenship question from the voter.

(Thomas Aff. ¶ 20.

### III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 empowers the Court to issue a preliminary injunction.

"A preliminary injunction is an extraordinary remedy which should be granted only if the

movant carries his or her burden of proving that the circumstances clearly demand it."

*Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  In

determining whether to grant a party's motion for preliminary injunction, this Court follows the

legal standard set forth by the United States Court of Appeals for the Sixth Circuit:

> When considering a motion for preliminary injunction, a district court must balance four factors:

> (1) whether the movant has a strong likelihood of success on the merits;

> (2) whether the movant would suffer irreparable injury without the
> injunction;
>
> (3) whether issuance of the injunction would cause substantial
> harm to others; and
>
> (4) whether the public interest would be served by the issuance of
> the injunction.

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir.

2007) (internal citations omitted). These factors were also utilized in two recent Sixth Circuit

election law opinions: *Obama For America, et al v. Jon Husted, ed al*, ___F.3d___ (6th Cir.

2012), 2012 WL 4753397 (October 5, 2012), and *Jolivette v. Husted, et al*, ___F.3d___ (6th Cir.

2012 2012 WL 4051214 (Sept. 14, 2012).

## IV.  ANALYSIS

### A.  Federal Law

Article I, Section 4 of the United States Constitution states:

> The Times, Places and Manner of holding Elections . . . shall be presented
> in each State by the <u>Legislature</u> thereof . . . .

(emphasis added).

This Court finds instructive the Supreme Court's language in *Bush v. Gore*, 531 U.S. 98

(2000), noting that the power to vote for the President of the United States flows from the state

legislature:

> The individual citizen has no federal constitutional right to vote for
> electors for the President of the United States unless and until the
> <u>state legislature</u> chooses a statewide election as the means to
> implement its power to appoint members of the electoral college. .
> . . This is the source for the statement . . . that the <u>state
> legislature's</u> power to select the manner for appointing electors is
> plenary; it may, if it so chooses, select the electors itself, which

18

> indeed was the manner used by <u>state legislatures</u> in several States
> for many years after the framing of our Constitution. . . .  When the
> state legislature vests the right to vote for President in its people,
> the right to vote as the legislature has prescribed is fundamental;
> and one source of its fundamental nature lies in the equal weight
> accorded to each vote and the equal dignity owed to each voter.

*Id.* at 104. (Emphasis added).  This Court has emphasized the consistent reference to the term

State Legislature, because in the instant case, the proposed legislation adding a citizenship

checkbox requirement before the State legislature last summer, was not enacted, despite

testimony in support by Defendant Secretary of State. Notwithstanding the legislative defeat,

Defendant thereafter issued a guideline or order mandating that additional checkbox requirement

on the poll application form.  Defendants issuance of the guideline or order appears not to

comply with the Michigan Statutes listing the requirements of the ballot application form, and

appears not to comply with the Michigan Administrative Procedures Act in mandating that

significant change, discussed *infra*.

On October 5, 2012, while the instant day-long hearing was taking place, the United

States Court of Appeals for the Sixth Circuit, issued an election law opinion regarding early in-

person voting in the November 2012 elections in the State of Ohio.  In *Obama for America*, 2012

WL 4753397 (October 5, 2012), the Sixth Circuit, on Fourteenth Amendment Equal Protection

grounds, affirmed the District Court's grant of a preliminary injunction preventing the State of

Ohio from enforcing a recently enacted law imposing, on non-military preelection day voters, an

earlier deadline for in-person early voting than previously allowed for all voters.  Plaintiffs

argued that  "the relevant statutory provisions burdened the fundamental right to vote but are not

necessary to any sufficiently weighty state interest." *Id*. at *1.  Ohio law had permitted in-person

early voting for all poll voters during the three days before the November 2012 election; the new

law limited that right to vote in the three day period before November 6 to military and overseas

voters.

The Sixth Circuit discussion of "Equal Protection in the Voting Context," began with the

following legal discussion:

> "The right to vote is protected in more than the initial allocation of the
> franchise.  Equal protection applies as well to the manner of its exercise."
> *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008)
> (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000). . . .  "Having once
> granted the right to vote on equal terms, the State may not, by later
> arbitrary and disparate treatment, value one person's vote over that of
> another." *Bush,* 531 U.S. at 104-15; *see also Westburry [v. Sanders*, 376
> U.S. 1, (1964)] at 17. . . .
> The Equal Protection Clause applies when a state either classifies voters in
> disparate ways . . . or places restrictions on the right to vote. . . .  The
> precise character of the state's action and the nature of the burden on
> voters will determine the appropriate equal protection standard.

*Id*. at *4.

The Sixth Circuit opinion explained that most cases fall between two extremes: no

burden on the right to vote – apply the rational basis standard, and where the state's

classification severely burdens the right to vote – apply the strict scrutiny standard.  The Court

concluded:

> Most cases fall in between these two extremes.  When a Plaintiff alleges
> that a state has burdened voting rights through the disparate treatment of
> voters, we review the claim using the "flexible standard" outlined in
> *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504
> U.S. 428 (1992).

*Id*. at *5.  The Sixth Circuit further explained:

> This standard is sufficiently flexible to accommodate the complexities of
> state election regulations while also protecting the fundamental

20

> importance of the right to vote.  This is no "litmus test" to separate valid
> from invalid voting regulation; courts must weigh the burden on voters
> against the state's asserted, justifications, and "make the 'hard judgment'
> that our adversary system demands." *Crawford [v. Marion County
> Election Board*, 553 U.S. 181] at 190 [2008] (Stevens, J., announcing the
> judgment of the Court).[9]

*Id*.  The Sixth Circuit concluded that "when a state regulation is found to treat voters differently

in a way that burdens the fundamental right to vote, the *Anderson-Burdick* standard [flexible

standard] applies." *Id*.

In the instant case, the Court concludes that the flexible standard applies, based on the

evidence before the Court, that because the Defendant Secretary of State's guideline/rule [not a

state statute] unjustifiably burdens the right to vote by creating election day time consuming

public confrontations between voters who refuse to fill in the citizenship check box and the

election officials, who after confronting the voter in public, will still issue the ballot without the

voter's compliance.  The Court finds that the Defendant Secretary of State's order and rules for

carrying it out classifies voters disparately, in many ways, absentee and poll voters, and even

within poll voters, those who check the box and those who don't, it has burdened the right to

vote, and further has not been sufficiently justified; likely confusion at the polls interferes with

the right of all voters.

The Sixth Circuit opinion, *Obama for America*, noted, in discussing the equitable factors

applicable to the preliminary injunction test; "When constitutional rights are threatened or

_____

[9] Justice Stevens' Opinion in *Crawford* was joined by two Justices.  Justice Scalia's
concurring opinion which was joined by two other Justices states: "It is for State Legislatures to
weigh the costs and benefits of possible changes to their election codes . . . ." *Crawford* at 208.
(emphasis added). This Court emphasizes: "State Legislatures" not State election officials
establish the state election codes.

impaired, irreparable injury is presumed.  A restriction on the fundamental right to vote therefore

constitutes irreparable injury."  2012 WL 4753397, at *12 (citations omitted). This holding

resolves a critical factor that this Court must find in issuing a preliminary injunction.

Despite the states' plenary power to select the manner for appointing electors, once it

grants that right to its citizens, "the State may not, by later arbitrary and disparate treatment,

value one person's vote over that of another."  *Bush v. Gore* at 104-05.

The Sixth Circuit has also noted the importance of "the fundamental right to vote, which

we recognize as preservative of all rights."  *Hunter v. Hamilton County Bd. of Elections*, 635

F.3d 219, 234 (6th Cir. 2011) (punctuation and internal citations omitted).  The Court's analysis

is "therefore guided . . . by the important requirement that state actions in election processes

must not result in 'arbitrary and disparate treatment' of votes."  *Hunter*, 635 F.3d at 234.

(emphasis added).  And in the instant case, we do not have a state action in an election process,

but rather a guideline from an election official which is not a law, and which, as noted *infra*, did

not comply with the Michigan Administrative Procedures Act.

**B.  Strong Likelihood of Success on the Merits of the Equal Protection Claim**

Plaintiffs argue that, based on the confusion that arose during the August 7, 2012 primary

election, Defendant's continued use of the citizenship verification question during the November

6, 2012 general election will disenfranchise voters in some jurisdictions, violating the Equal

Protection Clause.  Plaintiffs bolster their argument with written and testimonial evidence

showing (1) multiple incidents of polling place confusion in the August 7, 2012 primary election,

(2) the fact that 4 times as many voters will vote on November 6th, close to 5 million, (3) that in

addition to precinct workers confronting voters who don't answer the citizenship question, there

22

are likely to be many challengers present at the polling places, (4) inconsistent application of the citizenship verification question between absentee and polling place voters, and between polling place workers in different locations within Michigan.

Plaintiffs are not challenging the law that only citizens are entitled to vote in elections, or that persons seeking to register to vote must verify their citizenship at that time.  Plaintiffs' arguments are limited to the citizenship question check box in the voter application form, and the administration of the form at the polling place. Specifically, a polling place voter is provided a form that directs him to fill out the citizenship check box in the application, if he refuses, he is read a statement that you must be a citizen to vote, and then, whether or not he fills out the check box, he is provided a ballot.  The check box is like a ballot check box – an open area to be filled in or checked.  A voter could well assume that this check box is a preliminary voting issue that must be completed to get a ballot – even though the Defendant has now concluded that filling in the check box is not a prerequisite to receiving a ballot.

Defendant's argument in support of the need for this guideline or rule, is undermined by two non-confrontational, non-time wasting alternatives that accomplish the result of communicating to a prospective voter that only a citizen can vote; (1) a sign posted at every polling place that only a citizen can vote, or (2) as Governor Snyder recommended in his veto message adding a phrase in the ballot application form signed by all voters, that only citizens can vote.  Neither of these alternatives involve singling out and confronting a voter in public with an order, which if refused, is followed with a legal statement, and if the voter continues to refuse to fill in the box, he is still provided with a ballot.

23

Plaintiffs argue that the inconsistent administration of the citizenship verification question, noted *supra*, violates the Equal Protection Clause.  Plaintiffs contend that voters in districts where the citizenship question is being used will face delays caused by individuals who refuse to answer the citizenship question thereby triggering a public confrontation with the election worker in front of other voters and vote challengers.  Plaintiffs also argue that the inconsistent standards and confusion and delay caused by the citizenship check box issue will lead some voters to not go through the hassle or resulting delays, and not vote. The inconsistencies are that this citizenship question/required answer is not being applied to absentee voters per Defendant's orders, and not applied to many polling place voters because many clerks and election officers have concluded that Defendant's instruction is not valid because State Law applicable to ballot applications does not list that as a requirement to be on ballot application and her order appears *ultra vires*, and because Defendant appears to have failed to follow the Michigan Administrative Amendment Act in promulgating that requirement.

In *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the Sixth Circuit held that factual allegations showing "non-uniform rules, standards, and procedures that result in massive disenfranchisement and unreasonable dilution of the vote" could support an equal protection claim.  *Id*. at 478 (internal quotation marks omitted).  The facts alleged in that case included, *inter alia*, "causing more severe wait times in some counties than in others[,]" and inadequate training for poll workers "causing them to provide incorrect instructions and leading to the discounting of votes."  *Id*. at 478.

Defendant argues that Plaintiffs are not likely to be successful on the merits because their claims are barred by laches.  Defendant claims that Plaintiffs could have filed their lawsuit as

24

early as 2002, when a citizenship question first appeared on ballot applications, or in February

2012, when Defendant first began requiring the question on ballot applications.  *See Nader v.*

*Blackwell*, 230 F.3d 833, 835 (6th Cir. 2000) (noting that "plaintiffs could have pursued their

cause more rigorously by filing suit at an earlier date.  A state's interest in proceeding with an

election increases as time passes, decisions are made, and money is spent.").

Defendant's argument fails to consider that Plaintiffs' claims arise out of the Defendant's

inconsistent administration of the citizenship question check box that occurred in August 7, 2012

primary election, after Governor Snyder's July veto of Senate Bill 803.  Plaintiffs filed their

Complaint on September 17, 2012 after accumulating evidence in support of their claims based

in part on voter experiences at the August 7th primary.  This does not evidence laches by

Plaintiffs.

Further, as to the General Election on November 6, 2012, although absentee ballots have

been issued (no citizenship check box required), Defendant admits that the training period

deadline for election workers is not until October 17, 2012.  (Thomas Aff. ¶ 22.)

Defendant also argues that Plaintiffs lack standing.

> In order to satisfy the standing requirements of Article III of the
> Constitution, a plaintiff must show: "(1) it has suffered an 'injury
> in fact' that is (a) concrete and particularized and (b) actual or
> imminent, not conjectural or hypothetical; (2) the injury is fairly
> traceable to the challenged action of the defendant; and (3) it is
> likely, as opposed to merely speculative, that the injury will be
> redressed by a favorable decision."

*Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004) (citation

omitted).

25

The Sixth Circuit has held "that an association challenging election procedures need not identify specific voters who will be wronged by election workers because 'by their nature, mistakes cannot be specifically identified in advance[.]'" *Northeast Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1010 (6th Cir. 2006).

Plaintiffs have standing to pursue the instant claims.[10]  The organizational Plaintiffs "have standing to assert, at least, the rights of their members who will vote" in the November 6, 2012 election.  *Sandusky County Democratic Party*, 387 F.3d at 574.  Plaintiffs have also shown that they will suffer an injury that is real and imminent: voter disenfranchisement due to inconsistent administration of the citizen verification question, and to the in-public confrontation with voters who do not fill in the check box.  *See generally League of Women Voters*, 548 F.3d at 476.  The Court finds it significant that the Sixth Circuit did not address the issue of standing in the *League of Women Voters* case, and held that two organizational plaintiffs and individual voters did bring a challenge to the State of Ohio's voting system.  *Id*. at 466.

Plaintiffs' requested relief – removing or obscuring the citizenship verification question from ballot applications – will likely provide redress for Plaintiffs' claims that inconsistent administration of the question leads to delays at the polls, and certainly a lack of uniform application, to wit, absentee voters, and the many clerks that do not utilize that question in their polling place ballot applications.  The Court also notes that, while the organizational Plaintiffs may lack standing with regard to absentee ballots already submitted, *see Northeast Ohio*

---

[10]The Court reiterates that, in the present context, the Plaintiffs' arguments are considered under the "likelihood of success" prong within the preliminary injunction analysis.

*Coalition*, 467 F.3d at 1010 (noting that the reasoning for organizational standing in *Sandusky County Democratic Party* does not apply "to absentee ballot already submitted), and perhaps also absentee ballot applications already submitted, Plaintiffs's claims focus mainly on arbitrary treatment that is likely to occur on election day with in-person voters. Accordingly, Defendant's arguments regarding lack of standing does not demonstrate that Plaintiffs are not likely to be successful on the merits of their claims.

Defendant argues that no eligible voters will be disenfranchised and denied a ballot if the local poll workers follow the instructions given on August 7, 2012. (Thomas Aff., Ex. 8, Aug. 7, 2012 Release.) Defendant notes that none of the declarations attached to the Complaint indicate that the declarant was unable to vote, only that they were delayed by several minutes or had to return later in the day.

Defendant also states that she will take steps to ensure the consistent application of the citizenship question prior to the November 6, 2012 general election. Defendant notes that her August 7, 2012 instructions remain in effect, and were reiterated in her supplemental instructions on September 25, 2012. (Thomas Aff. ¶ 17, 20.) Director of Elections Christopher Thomas also states that he has scheduled training sessions for local clerks, which will include instruction on "proper" use of the citizenship verification question. (Thomas Aff. ¶ 22.)

Defendant further asserts that the significant media coverage of the citizenship question, caused in part by the instant litigation, has helped inform citizens that they should expect to see the question when voting on November 6, 2012. In addition, Defendant intends to issue press releases and use the Michigan Secretary of State website to inform citizens that the citizenship

27

question will appear on ballot applications, and that nobody will be denied a ballot for declining to answer the question.  (Thomas Aff. ¶ 23.)

The Court finds that those arguments do not undermine Plaintiffs' equal protection claims establishing a significant likelihood of confusion and delay by polling places due to Defendant's unwillingness to concede that her legal remedy to amend the law failed, and that her subsequent Guideline or Rule appears to be unlawful under the MAPA, and that lawful alternatives to assuring notice that only a citizen can vote, not involving a check box with potential confrontations, will accomplish the same result without disrupting polling place voting.

Plaintiffs have demonstrated through evidence introduced, and testimony at the hearing that, based on the August 7, 2012 primary election, inconsistent administration of the citizenship verification question will lead to extensive arbitrary and disparate treatment during the November 6, 2012 general election, endangering the right of all voters to vote at the polls. Importantly, the Court notes that the problems that occurred in August 2012 were most likely caused by inadequate education for poll workers regarding the citizenship question, particularly after Governor Snyder's July 3, 2012 veto of Senate Bill 803.  This inadequate training, coupled with the change in how the question was to be administered sent in the middle of the August election day, caused the lack of statewide standards, which in turn may have caused some voter disenfranchisement. Despite the Defendant's subsequent statements and the later training, the Court finds the entire scenario regarding the required polling place check box will create an unjustifiable interference with the right to vote at the polls on November 6, 2012.  A significant likelihood of disenfranchisement will occur on November 6, 2012, given a significantly increased voter turnout (close to 5 million) a longer ballot, an arbitrary and disparate treatment

of voters because of the likely holdup in voting caused by requiring the check box, ultimately infringing the Equal Protection right of all citizens to access the polls. *League of Women Voters*, 548 F.3d at 477-78.

Defendant contends that Plaintiffs' alleged constitutional violations are minimal and should not trump the state's interest in preventing the dilution of votes by non-citizens. But this "interest", does not apply to absentee voters and to the well over 1 million voters who will not be confronted by the question because their local clerks did not follow the Defendant's instructions.

The Supreme Court has held that "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion County Election Board*, 553 U.S. 181, 191 (2008) (citation and internal quotations omitted). Defendant has not shown a sufficiently weighty legitimate state interest that justifies the burden placed on Plaintiffs' voting rights. Defendant argues that the State of Michigan has an important interest in educating non-citizens who were mistakenly registered to vote that they are breaking the law, and to prevent votes from being diluted by non-citizen votes. However, Defendant has only produced a few specific instances of a non-citizen with a voting record. (Def.'s Appx., Ex. M, Sept. 18, 2012 Press Release.) Of those two, only one learned that he was not permitted to vote based on Defendant's citizenship verification question. And at the instant hearing, Defendant's Director of Elections, Christopher Thomas testified that at most only a handful of prospective voters turned out to be non-citizens. (*Id*.) Furthermore, Defendant's proffered state interest can be pursued by a less drastic means, i.e., putting the words "I am a United States Citizen" in the opening declarative statement on the application, as suggested by Michigan Governor Rick Snyder in his veto message. *See Illinois*

29

*State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 185 (1979) (noting that "our previous opinions have . . . emphasized that even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty, . . . and we have required that States adopt the least drastic means to achieve their ends." (citation and internal quotation marks omitted)).  Although "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters[,]" *Crawford*, 553 U.S. at 196, based on this record, the Court finds that Defendant's rationale does not outweigh the burden that non-uniform administration of the citizenship question will impose upon voters at the polling places.

Defendant claims that non-uniformity will not be a problem in the November 2012 election, because she will train local elections officials on proper administration of the citizenship question. But non-uniformity is already inherent in the system with regard to absentee voter applications and many local clerks who have refused to follow her rule.  It is noteworthy that the plaintiffs in *League of Women Voters* sought "preliminary and permanent injunctive relief requiring the Secretary and Governor '[t]o promulgate, adopt, and enforce uniform standards' related to various aspects of Ohio's election system . . . ." *Id.* at 469-70 (citation omitted).  This is essentially the relief that Defendant has claimed she will provide by training local elections officials.  (Thomas Aff. ¶ 22.)  Plaintiffs assert that training cannot solve the potential issues on November 6, 2012, "because it is expected that the voters will be even more 'discontented' with the checkbox question in the general election than they were in the primary."  (Pls.' Reply 6.)  Plaintiffs' focus in the Complaint, and the affidavits in support of it, are based on the potential for "confusion and inconsistent application regarding the citizenship

30

checkbox on the Application to Vote . . . ."  (Compl. ¶ 41.)  Plaintiffs have presented evidence

that voter discontent with the citizenship verification question may lead to arbitrary and disparate

treatment.  This likely discontent with the check box and even more compelling, the

confrontation procedure adopted by Defendants is not sufficient to support Defendant's interests

in educating ineligible voters about the citizenship requirement when non-confrontational

alternatives are available.

Significantly, even with Defendant's proposed training, local clerks will not uniformly

administer the citizenship verification question.  The record shows that some local clerks will not

place the issue and the box on the ballot application form because they believe Defendant's

requirement of the citizenship question violates Michigan law.  *See* Chad Livengood, *Clerks defy*

*ballot citizenship rule*, Detroit News, Sept. 14, 2012 (noting that some clerks refuse to include

the citizenship verification question based on Governor Snyder's veto, because "the secretary of

state has no authority to override the governor's authority.").  And of course, there are the

absentee voters who are not provided with the citizenship check box.

This Court further concludes, reading the Michigan Legislature's relevant enactments,

that Defendant appears to not have authority, under Michigan law, to require the citizenship

question box to be added to ballot applications.  If Defendant had authority to require the

citizenship question, then local clerks are required to follow her directives to include the

question and uniformly administer it.  Since it appears that Defendant did not have such

authority, and the Governor vetoed her Support Bill, many local clerks believe they are free to

disregard Defendant's guideline/instruction. *See* Mich. Comp. Laws § 168.931(h) (providing that

"[a] person shall not willfully fail to perform a duty imposed upon that person by this act, or

31

disobey *a lawful instruction or order* of the secretary of state as chief state election officer . . . ."
(emphasis added)).  On two grounds Defendant's instruction/guideline fails: (1) it appears
unlawful under Michigan law; and (2) even if within her power, the instruction/guideline appears
unlawful because Defendant did not follow the Michigan Administrative Procedures Act in
implementing this change. Thus, given the "lay of the land" – there will not be any uniform
standards applicable to the November 6th election with regard to the citizenship check box.

Plaintiffs have thus shown a strong likelihood of success on their Fourteenth Amendment
claim.

Plaintiffs contend that Defendant exceeded her legal authority under Michigan law when
she prescribed ballot applications with the citizenship verification question.  Defendant argues
that she had authority to change the ballot applications, and that she is immune from suit under
the Eleventh Amendment.

"The Eleventh Amendment generally bars suits by citizens against a state in federal
court." *League of Women Voters*, 548 F.3d at 474.  However, pursuant to *Ex parte Young*, 209
U.S. 123, 155-56 (1908), a state official may be sued in his or her official capacity for purely
injunctive relief.

The Complaint in this case notes that it is against Defendant "in her official capacity as
Michigan Secretary of State[.]"  (Compl.)  Plaintiffs seek only injunctive and declaratory relief.
(Compl. at 25-27.)  Accordingly, Plaintiffs' claims fit within the *Ex parte Young* exception to
Eleventh Amendment immunity.  *See League of Women Voters*, 548 F.3d at 475 (holding that
the defendants were not entitled to Eleventh Amendment immunity where the plaintiffs' claims
showed chronic and ongoing election violations and sought only prospective relief).

Defendant's Eleventh Amendment argument does not undermine Plaintiffs' ability to prevail on the merits.

Defendant argues that she has statutory authority to implement use of the citizenship question pursuant to Mich. Comp. Laws § 168.31(1)(e), which invests the Secretary of State with authority to "[p]rescribe and require uniform forms, notices, and supplies the secretary of state considers advisable for use in the conduct of elections and registrations."

Notably, Defendant admits that she is not permitted to implement new requirements on an absent voter ballot application without legislative amendment to Mich. Comp. Laws § 168.759(5). (Def.'s Resp. Br. 24.) Nevertheless, Defendant argues that she does have authority to alter the requirements for in-person ballot applications, because the language in Mich. Comp. Laws § 168.523, which governs in-person ballot applications, is less specific than § 759(5). This argument does not track!

Section 523 provides that, before receiving a ballot, a registered voter must "identify himself or herself by presenting an official state identification card . . ., an operator's or chauffeur's license issued to that individual . . ., or other generally recognized picture identification card and by executing an application showing his or her signature or mark and address of residence in the presence of an election official." The law further provides: "In precincts using voter registration lists, the date of birth may be required to be placed on the application to vote."

Section § 523 provides the exclusive requirements for an in-person ballot application in Michigan. The law provides specific requirements: (1) valid photo identification, (2) address of residence, (3) signature, and (4) date of birth (optional if the precinct is using a voter registration

33

list).  The law does not provide that these elements constitute a non-exclusive list of requirements, nor does it require that in-person voters affirm their status as United States citizens at the polls.

Defendant argues that § 523 should be read in harmony with Mich. Comp. Laws § 168.492, which enumerates the requirements for a registered voter in Michigan, including United States citizenship.  However, the Court finds it more in keeping with the cannon of statutory interpretation, *in pari materia*,[11] to read § 523 in harmony with § 759(5), which enumerates the content of absentee voter ballot applications.  Section 759(5) does not contain a citizenship verification question, or any other affirmation of citizenship. Indeed, Defendant appears to concede that there is not citizenship affirmation question on her present website for an individual to apply for an absentee ballot.

In finding that Defendant appears not to have authority to unilaterally change ballot applications, the Court has found significant the fact that Defendant this past summer, sought legislation to amend § 523 so that it would include a citizenship verification question.  (Compl., Ex. 1, S.B. 803.)  The legislation was vetoed by Governor Snyder, who suggested that Defendant can achieve her goal of ensuring only qualified voters participated in elections by "simply includ[ing] US citizen in the voter's opening declarative statement on the application."  (Compl., Ex. 4, Veto Letter.)  Rather than seek new legislation incorporating the Governor's suggestion, Defendant continued to require the citizenship verification question on ballot applications.

Defendant's requiring use of the citizenship verification question appears to be *ultra vires*.  While Defendant does have authority to "[p]rescribe and require uniform forms" pursuant

---

[11]The Latin phrase *in pari materia* means "Upon the same matter or subject."

to § 168.31(1)(e), she cannot alter the requirements of ballot applications, which are specifically provided by law under §§ 523 and 759(5).  The Court, of course, considers this issue in the context of the Equal Protection claim in weighing the preliminary injunction factors.

Plaintiffs argue that Defendant violated MAPA by requiring the citizenship verification question on ballot applications.

Mich. Comp. Laws § 168.31(1)(a) states: "The secretary of state shall . . . issue instructions and promulgate rules pursuant to the administrative procedures act . . ., for the conduct of elections and registrations in accordance with the laws of this state." This does not create an "open season" for Defendant to write new laws, and then say they are not new laws, and even though significant in content, avoid the MAPA.  "[W]ithout a clear legislative intent to waive the requirements of the MAPA, we will not sanction state agency 'law-making' in the absence of the legislatively designed protections of the APA."  *Danse Corp. v. City of Madison Heights*, 466 Mich. 175, 184 (2002).

*Danse* further held that "where the statutory language is unambiguous, the plain meaning reflects the Legislature's intent and the statute must be applied as written." *Danse* at 182.  In the instant case, the State Legislature's statutory language with regard to voter application forms is unambiguous. Defendant does not dispute that she did not follow MAPA before requiring local elections officials to use the citizenship verification question.  Rather, Defendant contends that she had authority to require the citizenship question independent of MAPA based on the statutory authority granted to her by § 168.31(1)(e).

As explained *supra*, § 168.31(1)(e) does not give Defendant authority to change ballot application requirements that are specifically provided by law.  Defendant's authority to

promulgate new rules with regard to ballot applications, if she has such authority, would be derived under § 168.31(1)(a), which requires rules to be promulgated pursuant to MAPA. Defendant admits that she did not follow the MAPA.

## C.  Irreparable Injury

Plaintiffs argue that immediate injunctive relief is necessary to avoid irreparable injury to their voting rights in the November 2012 general election.  "Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."  *Overstreet*, 305 F.3d at 578.

Defendant asserts that Plaintiffs will not suffer any harm in the November 2012 general election.  Defendant contends that her most recent instructions assure that every eligible voter will eventually receive a ballot, regardless of whether they complete the citizenship verification question.  Defendant's argument here is unavailing for reasons stated *supra*.

Defendant also argues that the relief requested will not remedy the problems with absentee ballot applications, many of which have already been mailed.  The Court notes, however, that the Complaint and Plaintiffs' Motion focus on administrative difficulties on election day, as evidenced by the confusion during the August 7, 2012 primary election.  The majority of the relief Plaintiffs request will therefore be remedied by a preliminary injunction.

The Court finds that this factor weighs in favor of granting Plaintiffs' Motion.

## D.  Harm to Others

Plaintiffs assert that the harm in granting an injunction is minimal in comparison to the Fourteenth Amendment violations that will likely occur if their motion is denied.  Defendants note that some local clerks who have ordered ballot applications will have to shoulder the cost

36

and trouble of obscuring the citizenship question on the applications.  This burden is slight, however, compared to the potential constitutional violations caused by arbitrary and non-uniform administration of the citizenship question, and in addition the confrontational situation ordered by the Defendant against the voter who does not fill in the box in the application.

Defendant claims that the alleged harm claimed by Plaintiffs is minimal, because only a few polling locations reported problems with the citizenship question in the August 2012 primary.  It is a given, that confusion, and holdups of citizens who have not filled in the check box, in receiving the ballots would likely create a significant potential for disenfranchisement, because voter election official public confrontations will be more widespread and prevalent in November, as turnout for the presidential election will be at least four times as large than it was for the presidential primary in August; likely 5 million voters.

In balancing the harm to both parties and the public, the Court finds that this factor weighs in favor of granting Plaintiffs' request for a preliminary injunction.  The harm to Defendant is minimal, as she can simply amend her prior instructions on the citizenship question. The harm to local clerks is also fairly minimal, although some will have to undertake the time and effort of obscuring the question on ballot applications.  This minimal harm does not outweigh the potential constitutional violations that could occur if the citizenship question is not uniformly administered. Further, given the parade of horribles involving a likely crowd of vote challengers, acknowledged in the testimony of Elections Director Christopher Thomas, who will likely be ready to challenge voters who refuse to fill out the check box even though they don't have to in order to receive a ballot, and other potential voters who are forced to wait because of

the check box time-taking confrontations with election workers, there is significant potential to deprive other citizens of the right to vote.

## E. Public Interest

"[T]he public clearly has an interest in vindicating constitutional rights . . . ." *Overstreet*, 305 F.3d at 579 and the right to elect a President is the highest constitutional right. Additionally, the public has an interest "in promoting public confidence in the integrity of local government and in avoiding the perception of a conflict of interest between government employees' private interests and their public duties." *Id*.

In the instant case, the public interest weighs in favor of granting an injunction. Plaintiffs' request for an injunction will remedy the likely constitutional violations during the November 2012 election. The injunction will also serve the public interest in the integrity of local government, as Defendant appears to have exceeded her authority under Michigan election law by requiring the citizenship question on ballot applications.

Defendant claims that Michigan citizens will be harmed if the citizenship verification question is not used on ballot applications, because mistakenly registered non-citizens who are unaware of the citizenship requirement for voting will dilute the vote.

The Court finds that Defendant's claim of voter dilution – at most a "handful" in the August Primary election, according to Director Thomas' testimony – presents a minimal burden that is not outweighed by the potential harm to the voting public's constitutional right to access to the ballot.

The Court finds that the public interest will be served if an injunction is granted.

## F. Summary

38

Plaintiffs have established that the non-uniform administration of Defendant's citizenship verification question during the August 7, 2012 primary election led to delays for some voters who refused to answer the question. Next month the State of Michigan will likely have close to 5 million voters, most of whom will encounter the citizenship check box at the polls.  Certainly, Governor Snyder's July 2012 veto of Senate Bill 803, and his veto message, conveyed to Defendant Secretary of State how to legally accomplish the issue of letting a voter know that U.S. citizenship is required to vote.  The Court has noted them, too: (1) add a sentence to the application form that says you must be a citizen to vote, (2) and/or put up a sign at the polls stating that.  Although the August 2012 delays were not substantial, delays are likely to be greatly multiplied during the November 2012 presidential election, which is expected to have a turnout of 4 times more, and challengers at the ready. It is likely that many challengers will challenge voters who do not fill in the citizenship check box, even though they do not need to fill it out to get a ballot – because the challengers don't know that voters are not required to fill it in!

The Court finds relevant the following, gleaned from the testimony of Christopher Thomas, Director of Elections for the Michigan Secretary of State at the Preliminary Injunction Hearing on October 5, 2012:

> 1.  While there is no SOS mandated dialogue between the election inspector and the poll voter who does not fill in the citizenship checkbox, he does recognize that there could be a dialogue when the election inspector confronts a voter who refuses or neglects to answer the citizenship checkbox.  TR. P. 26.
>
> 2.  That during the August 7th primary, he received calls from two groups, relating to the citizenship checkbox issue concerned about the implementation at the polls and that people were walking out.

3.  That 36,000 people voted in the September 2012 special Congressional election.  TR. P. 30.

4.  That there will be more than 30,000 election inspectors for the November 6, 2012 election.  TR. P. 31.

5.  That the citizenship question will not be on the absentee voter application to vote – on advice of counsel.  TR. P. 40.

6.  That although the voter's citizenship has always been a basis for challenge at the polls, he does not believe it is a valid challenge against a voter who refuses or neglects to fill in the citizenship checkbox, is read a statement and is thereafter given a ballot. TR. P. 44.

7.  That in the SOS's voter education information, he is not sure whether voters will be told that they won't have to answer the citizenship question – "we may." TR. P. 55.

8.  That the Election Inspector Procedures Manual has not been rewritten to describe a procedure for the citizen checkbox.  TR. P. 59.

9.  That "a handful" of noncitizens were deterred from voting in the February and August elections by the presence of the citizenship question on the application to vote – "not a large number."  TR. P. 63.

10.  That challengers could quite possibly impose a challenge against a person who did not fill out the citizenship checkbox.  "If somebody wanted to say 'I challenge this person based on citizenship' they could say that." That the SOS has not yet put out materials with regard to the checkbox.  "I believe we have not."  But they will.  TR. Pp. 80-81.

11.  That political parties each get two challenges at each precinct at the election and that other groups can request local jurisdiction to have challenges as well.  These other groups requesting challenges can include an "entity supporting or opposing a ballot question or they can be a group that is organized for the purity of elections." "There could be a crowd. Yeah, it's a very public place."  TR. P. 82.

"[T]here's not a finite number of challenge organizations."  TR. P. 83.

A challenge is done "in public."  TR. P. 86.

12.  That "it's a very large ballot."

Indeed, it is certain that there will be non-uniform statewide standards even if Defendant now attempts to instruct local clerks on the use of the citizenship question, because many local clerks have concluded that Defendant appears to have exceeded her authority under Michigan law by requiring that the citizenship question be added to all ballot applications, and that they are not required to follow Defendant's unlawful instructions. Mich. Comp. Laws § 168.931(h). Nor did Defendant appear to follow State law by creating a "guideline" or "instruction" that has a significant impact on voters at polls without following the MAPA procedures.

Accordingly, the Court also finds that Defendant appears to have exceeded her authority under Michigan statutory law by (1) unilaterally requiring the citizenship verification question to be added to ballot applications, (2) and that even if Defendant could do so, Defendant appears to have failed to follow the Michigan MAPA. Further, Defendant acknowledges that she will not be able to enforce uniform statewide standards regarding the question during the November 2012 election because filling in the citizenship check box is not required to get an absentee ballot, and many clerks will not utilize it. These points combine with the previous discussion of the likelihood of confusion, confrontation and disruption at the November 6, 2012 election. Plaintiffs have therefore met their burden of showing a strong likelihood of success on the merits. Plaintiffs have also met their burden of showing that they will suffer irreparable injury absent an injunction, and that the potential harm to others and public interest weigh in favor of injunctive relief. Accordingly, the Court will grant Plaintiffs' motion.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction.

41

The Court **ORDERS** that:

(1) Defendant, and all those acting in concert or cooperation with Defendant and her agents, immediately cease and desist from requiring or permitting inclusion of the citizenship verification check box question on the Application to Vote and Application for Absent Voter Ballot;

(2) Defendant immediately notify and instruct all county and local clerks that the citizenship verification question is not to be included on Applications to Vote or Applications for Absent Voter Ballots, and that the question is to be removed or obscured on Applications to Vote where necessary.

**SO ORDERED.**

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  October 10, 2012

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on October 10, 2012.

S/Denise Goodine
Case Manager